NEW ORLEANS, MAY, 1874. 517

New Orleans, Mobile and Chattanooga Railroad Company v. City of New Orleans.

No. 3692.

NEW ORLEANS, MOBILE AND CHATTANOOGA RAILROAD COMPANY *v.*
THE CITY OF NEW ORLEANS et als.

A thorough examination of the question has led this court to the conclusion that the State
has the power to grant to a railroad company the right of way through a street in the
city of New Orleans.

APPEAL from the Eighth District Court, parish of Orleans. *Dibble*,
J. *J. A. Campbell* and *J. B. Eustis*, for plaintiff and appellee.
*George S. Lacey* and *W. W. King*, for the city of New Orleans, appellant. *Lea, Finney & Miller*, for Pontchartrain Railroad Company,
appellant. *Leovy, Monroe & Miles Taylor*, for Morgan et als.

WYLY, J. This controversy arises out of the acts of the nineteenth
March, 1868, seventeenth February, 1869, and twenty-first February,
1870, granting to the New Orleans, Mobile and Chattanooga Railroad
Company, for passenger and freight depots a space of ground, equal to
about four squares, on the batture or levee in front of the city of New
Orleans, between Calliope and Canal streets, and also granting the
right to lay tracks and occupy as a railroad a strip of land extending
down the levee to Elysian Fields street, and out said street to Claiborne street, and beyond it.

The plaintiffs took possession and injoined the city of New Orleans
and other parties from interfering with them in any manner. The
city denied the validity of the grant; on the ground that the State had
no right, title or interest in the property; and alleged that the batture
and street in question belong to it, and that the State could not make
the divestiture, or deprive New Orleans and its inhabitants of the use
of said public place and highway, without the exercise of the right of
eminent domain. And this respondent further says: "That the construction of the New Orleans, Mobile and Chattanooga Railroad by the
route contemplated through the city, and the running therein passenger and freight trains, propelled by steam engines or locomotives, and
the enjoyment of the grant and the privileges set forth and contained
in the several acts referred to, will prevent the use of the batture and
Elysian Fields street as a *locus publicus* and a highway; will destroy
the dedication thereof to the public; and will give the plaintiffs the
exclusive use of property which belongs to and is needed by New
Orleans and its inhabitants."

The court maintained the demand of the plaintiffs and perpetuated
the injunction. The city of New Orleans appeals. By consent of
parties the issue, as to the Pontchartrain Railroad Company, joined as
codefendants herein, is reserved from the present decision, and as to
them the case is indefinitely continued. The question is: had the
General Assembly the right to grant to the New Orleans, Mobile and

518          SUPREME COURT OF LOUISIANA,

New Orleans, Mobile and Chattanooga Railroad Company v. City of New Orleans.

Chattanooga Railroad Company, for passenger and freight depots and tracks, the property in controversy ?

If the fee or title to the soil belonged to the State, and its use, as public places, ceased to be necessary, of course the State, as the proprietor, could make the grant. But it is shown that the State had no title whatever to the property, and it is proved beyond question that its use is necessary for the public. The title of the city to this property is as clear and well established as the title of any political corporation can be to common property, or property dedicated to public use. That portion of the batture given for depots between Calliope and Canal streets was undoubtedly the property of Livingston and the other riparian proprietors who conveyed it to New Orleans, and dedicated it to public use in the act of donation or compromise of 1820. This cession and dedication was recognized and approved by the Legislature.

The batture in front of the old city was reserved for and dedicated to public use when the city was laid out in 1724; and since that time it has been used as a levee or quay. If the fee or title to the soil remained in the sovereignty of France, it passed to the United States by the cession, because France ceded forever and in full sovereignty the territory of Louisiana, with all its rights and appurtenances. The ground in question, therefore, passed to the United States if it was public property, and it was not transferred to the State of Louisiana when it was admitted into the Union, because the convention which formed the constitution acceded to the terms upon which Congress admitted the State into the Union, and by an ordinance forever renounced all right or title to the waste or unappropriated lands. This was expressly decided in the case of De Armas, 5 La. 207. In a controversy between New Orleans and the United States in relation to the ground in question, it was decided in 1836 by the highest tribunal of the land that the United States was without title. 10 Peters 662.

That Elysian Fields street was conveyed to New Orleans and dedicated to public use by Bernard Marigny, and has been occupied as a public highway since 1805, is not disputed.

It is shown that the occupation of these public places by the plaintiffs and the running thereon of passenger and freight trains, propelled by locomotives, prevent the use and enjoyment of them by the public, and to a great extent defeat the object of their dedication. The street and quays in question were not granted to New Orleans and dedicated to public use, to be owned and occupied by the Chattanooga Railroad.

The witness Captain Leathers says: "I am engaged in the steamboat business, commanding steamer Natchez. I have been engaged in the business above thirty-five years. During the last thirty years have

been making weekly landings at the port of New Orleans, discharging cargoes of cotton principally. I am very familiar with the river business which is now being done, and which has been done for many years past on the levee of this city. From the wood-work or wharves back to the houses that line the levee, say from Calliope down to Canal street, there is scarcely room enough to do the river business, by which I mean the business of receiving and shipping freight by the river Mississippi.

"I am very familiar with the levee, from Canal down to Jackson Square, which is between St. Peter and St. Ann streets. There is not more than enough of levee between Canal street and Jackson Square, and the houses that front the river and the river itself, to do the business which is now carried on by steamboats and sea going vessels.

"I am familiar with the tracks of the Chattanooga Railroad as now laid, say from Calliope street down to Jackson Square. The effect of the Chattanooga Railroad, with its passenger and freight trains and many tracks, is to leave the ships and steamboats without one-third room enough to do their business. The passing to and fro of those trains, and carrying on the business of the road, would, in my opinion, have the effect of giving to the road almost, if not entirely, the exclusive use of the batture or levee. There is constantly through the day, and all hours of the day, a large number of horses and mules engaged in transporting the river freight, to and from the levee, to the steamboats and ships and seagoing vessels; and I think the passing of the locomotive up and down the levee, would seriously interfere with the teams and drivers; there are frequently instances of those animals being frightened and running away and endangering their lives, as also the lives of others. I have seen the cars stopped at the front of my boat several times, entirely blockading my gangway and stopping my hands from putting out freight during that time. The road has left no room scarcely between the track and the boats. I am not the only one that has been subjected to this kind of inconvenience; there have been several boats and many of them. As the business of the road increases, the river business will be subjected to a corresponding increase of inconvenience, amounting almost to an entire deprivation of the use of the levee. The river business is now almost entirely blocked up from Jackson Square to Customhouse street, and from there nearly ruined by the railroad up as far as St. Joseph street, where the Chattanooga road comes to the river and occupies the entire front. To my knowledge the business of the river has been so obstructed by the use of the batture by the Chattanooga Railroad Company, that cargoes of cotton at Vicksburg have been shipped to Savannah, and many owners have shipped their cotton to other ports, which otherwise would have

come to New Orleans. In my opinion, one-half of the sugar crop will go up the river and not land here on that account. The use of the batture by the road, as laid down, is tantamount to a monopoly of the batture."

The testimony of this witness is corroborated by that of a number of other witnesses, and, indeed, the truth thereof is not controverted.

If a political corporation can be the owner of property, of which there can be no doubt, it alone can exercise the right of disposition over its property ; because, the right of disposition is an essential element of perfect ownership.

If the State can grant the property of New Orleans, as attempted in the case before us, New Orleans would cease to be the owner of its own property ; because, it is the owner who has the exclusive right freely to dispose of his property.

Undoubtedly the State can exercise the right of eminent domain and take for public purposes the property of political corporations, as well as the property of individuals, upon paying the owners the value of the property so taken. But, that is not the controversy here. The question is, can the State give the property of New Orleans to the Chattanooga Railroad Company ? We think not.

But it is contended that as the grounds in controversy were dedicated to public use, therefore, they are a part of the public domain of the State which can be alienated by it. This is a fallacy. The fee or title was never in the State ; therefore, these public places form no part of the public domain of the State. And, as we have said, the State can not grant what it does not own.

The property of the city dedicated to public use is as much its property as any that it may acquire. Indeed, the streets, walks and quays are more useful and essential to the city and its inhabitants than any other property, and they are inalienable by the State. "There can be no difference in principle between ground dedicated as a quay to public use, and the streets and alleys of a town, and as to the streets it may be asked whether the King could rightfully have granted them. This will not be pretended by any one. And it is believed that the public right to a common, is equally beyond the power of the sovereign to grant, unless he disposes of it under the power to appropriate property to national use, and then compensation must be paid." New Orleans v. United States, 10 Peters 662.

" The inhabitants of a town can not be deprived of their streets, as the streets are essential to the enjoyment of their property. In other words, by closing the streets the value of the buildings of the town would be greatly reduced, if not entirely destroyed. And if ground, dedicated to public use, which adds to the beauty, the health, the con-

venience, and the value of town property, be arbitrarily appropriated by the sovereign to other purposes, is not the value of the property which has been bought and sold in reference to it, greatly impaired? The value may not be reduced to the same ruinous extent, as it would be to close the streets, but the difference is only in the degree of the injury, and not in the principle involved." 10 Peters 662

If the State could grant part of the quays and street in question for depots and railroad tracks, it could grant the whole ; it could grant all the streets and public places, and entirely deprive the city of access to the river and virtually make its inhabitants prisoners in their own houses. The grant to the plaintiffs differs from this only in the degree of the injury, not in the principle involved. If the State could make the grant it can authorize the inclosure of the tracks, as it did the space given for the depots, and this would virtually close the port of New Orleans, because the inclosure of the tracks, extending along almost the entire front, would cut off communication with the river and destroy the commerce of the city. But it is urged that the State can dispose of the property of New Orleans, because it granted it corporate powers and can, at will, modify or abolish the charter. It is true the powers of government delegated to the city may be revoked and its charter abolished; but it by no means follows that the property of the corporation would pass thereby to the State.

"In respect to public or municipal corporations (says Mr. Kent), which exist only for public purposes, as counties, cities and towns, the Legislature, under proper limitations, have the right to change, modify, enlarge, restrain, or destroy them, securing, however, the property for the use of those for whom it was purchased." 2 Kent 305. Notwithstanding the power of the Legislature over the city of New Orleans its property is protected like that of any other person. Story on the Constitution, sections 1393, 1399 ; 2 Peters 380, 412, 413, 627, 657 ; 6 Cranch 67, 134 ; 4 Hill 144 ; 3 Dallas 386 ; 8 Wend. 85 ; 18 Wendall 56, 61, 63 ; Cooley on Limitations 487; 21 Penn. 147 ; 7 Wal. 289 ; 9 Cranch 292 ; 5 Paige 147; 11 Wend. 151; People ex rel. Failing v. Commissioners of town of Palatine, 53 Barbour and 3 American Law Times Reports, page 6; Constitution, art. 110; Constitution of United States, art. 1, section 10.

In Dartmouth College v. Woodward, 4 Wheaton, Justice Story says: "It may also be said that corporations, such as towns, cities and counties, may in many respects be subject to legislative control. But it will hardly be contended, in respect to such corporations, that the legislative power is so transcendent that it may, at its will, take away the private property of the corporation, or change the uses of its private funds, acquired under the public faith. Can the Legislature con-

fiscate to its own use the private funds which a municipal corporation holds under its charter, without any default or consent of the corporators? If a municipal corporation be capable of holding devises and legacies to charitable uses, as many municipal corporations are, does the Legislature, under our forms of limited government, possess the authority to seize upon these funds, and appropriate them to other uses, at its own arbitrary pleasure, against the will of the donors and the donees? From the very nature of our government the public faith is pledged the other way.    *    *    *    The truth is, the government has no power to make a grant, even of its own funds, when given to a private person or a corporation for special uses."

The Legislature certainly has no greater power than the sovereigns of France and Spain had in reference to the batture or levee in question. And the Supreme Court of the United States held in the case in 10 Peters referred to, where a part of the identical property was in controversy, that "the public right to the common was beyond the power of the sovereign to grant." New Orleans or its inhabitants had, therefore, a right to the levee or quay which could not be defeated, and it was "beyond the power of the sovereign to grant" this property to any one, long before Louisiana became a State, and long before there was a grant of corporate power to the city. The right to use the batture as a public place, therefore, exists independently of the delegation of corporate power, and the modifying or withdrawing thereof can in no manner affect it. So, therefore, whether the State recall the power of government delegated to the city or not is immaterial. The right of the inhabitants can not be defeated, because the proof shows that the levee is absolutely necessary to public use, and the occupation thereof by the plaintiffs impairs and greatly defeats the object of its dedication.

When a *locus publicus* becomes unnecessary for public use, of course the State can change the destination; it then becomes property in commerce, belonging to and subject to the will or disposition of the owner, whose rights were in abeyance pending the existence of the charge or servitude. But without the consent of the donors and the donees, as in the case before us, the State can not take property dedicated to one purpose and apply it to another. It can not take the batture granted to New Orleans for a quay, and to be used for the commerce of the river, and give it or any part of it to the Chattanooga Railroad. As the State was utterly without title, the grant to the plaintiffs conferred no right whatever to the property.

It is useless to argue that the grant to the railroad only gives a temporary use of the ground, and that it is subject to be recalled by the State. If the State had the right to make the grant, the plaintiffs have

the perpetual use of the property which is equivalent to ownership, and the State can not recall or in any manner defeat it, because of the provision of the Federal Constitution prohibiting a State from impairing the obligations of a contract.

It is also absurd to argue that the grant is only the exercise of administrative power over these public places. A grant which confers exclusive use in perpetuity, and subjects the thing granted, to such debts and incumbrances as the grantees may see fit to impose, can not fairly be called the exercise of merely administrative power over a *locus publicus*.

The grant virtually changes the destination and passes the title (if the State had any to pass), because it puts the property in commerce and subjects it to the exclusive control and disposition of the plaintiffs; makes it, as the common pledge of their creditors, liable to seizure under execution. Here then, a considerable part of a *locus publicus*, proved to be essential to the existing object of the dedication, is granted to a private corporation in perpetuity ; can be sold, mortgaged and otherwise subjected to their debts, and yet it is gravely argued that this is not a change of destination and a grant of the fee, but is only a mode of regulating or administering a *locus publicus*, which the State can rightfully exercise. The proposition is too absurd to require serious argument to refute it.

After carefully examining the record and considering the authorities and able printed arguments presented by the eminent counsel engaged in this litigation, we have come to the conclusion that plaintiffs must fail in their demand, for two reasons, either of which seems to be fatal to their pretensions :

*First*—Because the Legislature could not change the destination of these public places, bring them into commerce and subject them to the disposition of the plaintiffs, while the object of the dedication continues, and it is proved that these public places are now essential to the uses for which they were dedicated to the public.

*Second*—Because, if the State could have changed the destination, it could not have granted the property, because the moment the charge or servitude in favor of the public is removed, the property stands subject to the will and disposition of its owner, the city of New Orleans; and like all other property in commerce it can only be disposed of by the owner. As the State was not the owner the plaintiffs acquired no title by the grant.

Much has been said of State sovereignty and of the power of the State over the city, but we can not in this controversy adjust the matter or determine the limits of this power, because the State is not a party; and because the solution of the question is not necessary in this

case. The State has simply passed, by the grant, whatever title it had to the plaintiffs; and this suit is simply a controversy for property between persons holding by different grants. In order, therefore, for the plaintiffs to recover, they must show a title superior to the titles of those who granted the property to New Orleans and dedicated it to public use. So, therefore, whether the public places in controversy can be administered by the State or the city, is a question that does .not concern the plaintiffs. When it is ascertained, as we have, that they acquired no title by the grant, their cause of complaint is ended.

It is therefore ordered that the judgment herein be annulled and the injunction be dissolved ; and it is now ordered that there be judgment for the city of New Orleans, and that its prayer, in reconvention for an injunction be granted, and it is ordered that the plaintiffs be restrained and inhibited from occupying the property in controversy. It is further ordered that plaintiffs pay costs of both courts.

HOWELL, J. The plaintiffs' counsel states the question in this case thus: "Has the State the power to make the grants of authority to the plaintiffs to lay tracks, construct depots and to occupy the batture for the purposes set forth in the acts of the Legislature relative to the corporation ?"

I think the Legislature may grant such authority as to "public places;" but, in my opinion, a portion of the batture embraced in the grants has been reduced to the ownership of the city of New Orleans, and as to such portion the authority of the State is no greater than as to any other property held in private ownership, so long as the municipal corporation exists.

I therefore concur in maintaining the injunction in favor of the city only as to the property or squares shown to belong to it; but in other respects I think the judgment of the lower court should be affirmed.

MORGAN, J. I concur in the conclusions arrived at in the opinion pronounced by Mr. Justice Wyly, and reserve the right to place the grounds of my concurrence in a separate opinion.

LUDELING, C. J., dissenting. The opinion of my associates in this case is, according to my understanding, so diametrically opposed to the jurisprudence of this State, and most of the other States of this Union, that I am compelled to dissent from it.

The question involved in this case is simply whether or not the Legislature can control the public quay or levee of the city of New

Orleans without the consent of the city. To show that this is the question for decision, I quote from the brief of the counsel for the city:

### "BATTURE ABOVE CANAL STREET.

"The King of France, prior to the year 1763, granted to the Order of Jesuits, for a plantation, certain property lying on the Mississippi river, above Canal street, having thirty-two arpents front on the Mississippi, and running back to a depth of about fifty arpents; and for the same purpose he granted to various other persons property lying above the aforesaid thirty-two arpents. In 1763, the Jesuit plantation was confiscated by the French government, divided and sold. The first subdivision above Canal street, thus sold, contained, say seven arpents, *face au fleuve;* and five other subdivisions of five arpents each were sold in like manner. One Bertrand Gravier acquired the first subdivision about 1788; the second, lying immediately above Gravier, was acquired by Delord Sarpy, the dividing line between the Gravier and Delord Sarpy claims being now designated by Delord street. Gravier, in 1788, divided his property into squares and lots, and annexed them to the city as suburb Ste. Marie. Sarpy converted his property from rural into urban in 1806. At that time the 'big road,' now Tchoupitoulas street, formed the division between the lots of ground and the batture in front thereof, which was then used by the public as a *locus publicus.*

"Edward Livingston and others, claiming, as riparian proprietors, to be the owners of the entire alluvion or batture in front of the aforesaid suburb of Ste. Marie, and the accretion to become attached to the same, by a certain act between themselves and the city of New Orleans, bearing date on or about the twentieth day of September, 1820, dedicated the aforesaid batture and future accretion to public use, and to the purposes of business and commerce, and upon the express understanding and condition that the same should thereafter remain and continue a *locus publicus,* out of commerce, and not affected by any adverse claim or grant which might be set up.

"Under, and from the time of the dedication above referred to, that portion of the batture on and over which the New Orleans, Mobile and Chattanooga Railroad Company claim to construct their buildings and to run their road, with certain exceptions, which will be shown hereafter, remained open for use as a public place, until the rights of the public to the same were interfered with by the said company.

### "BATTURE BELOW CANAL STREET.

"On the sixth day of September, 1717, a charter was granted by the King of France to a corporation styled the "Western Company;" and under the auspices of that company, the ground where the old city of

New Orleans now stands, was selected as a place for the principal set-- tlement of the province, and the foundation of the city was laid. In 1724 and 1728, all the batture lying in front of the old city of New Or- leans was laid off as a quay ; and thus and otherwise, was dedicated as a *locus publicus*, and as common property, to the use of which, all of the inhabitants of the city of New Orleans, and even strangers, be- came entitled.

### "ELYSIAN FIELDS STREET.

" All that portion of ground or real estate claimed by the plaintiff, and over which they seek to run their road, extending from the point of intersection of the batture lying in front of the old city of New Orleans, with Elysian Fields street, back to the point where the last mentioned street intersects with Claiborne street was dedicated by private indi- viduals, by ordinances of the said city of New Orleans, and otherwise, as parts of a public street or highway, and for the convenience and use of inhabitants of the said city and others ; and the same has been pos- sessed, used and enjoyed, as a street highway or public place, for more than thirty years before the commencement of the present suit."

The interference of the New Orleans, Mobile and Chattanooga Rail- road Company complained of was authorized by an act of the General Assembly of Louisiana, which act the defendant alleges is unconstitu- tional because it divests vested rights, and authorizes the taking of private property without just compensation. It is manifest, therefore, if the General Assembly has the right to control the use of this public place, nay, even to change its destination, the interference of this com- pany is not unlawful. As early as 1848 this court held, in Delabigarre *v.* The Second Municipality of New Orleans, that " the sovereign alone has the right to change the destination of public places. Under the state of facts presented by the record, the attempt of the defendants to change the destination of the ground was a glaring usurpation of power, from which no legal effects could result." The usurpation spoken of in that case was the passage of a resolution by the municipality order- ing a portion of the batture to be sold.

In Parish *v.* Municipality et al.; this court said : " We have already stated that the conditions appended to the nominal gift of the batture amounted to a dedication of it to the public, to be used as an open space, and had no other object. The defendants might, for purposes of public utility, thus deprive the city of the right of alienating the batture, or of erecting buildings upon it. But, as we held in the case of the State of Louisiana *v.* The Executors of McDonogh et al., such a stipulation was at all times under the control of the Legislature, who could modify the effects of it and change the destination of the prop- erty, whenever such a change became of public advantage. Its power

to change the destination of it was expressly recognized by us in the case of Delabigarre v. Second Municipality, 3 An. 330. The power of the Legislature to change the destination of public places had been previously recognized in the case of De Armas v. The Mayor et als., 5 La. 174 and 194; the Mayor et als. v. Hopkins, 13 La. 351; New Orleans v. United States, 10 Peters 733 ; Municipality No. 2 v. New Orleans Cotton Press, 18 La. 122. These cases were all argued by the ablest counsel at the bar, and the opinions of the court were prepared with uncommon care. In two of them, Judge Martin dissented on other points, but the court was, in all the cases, unanimous in recognizing the power of the Legislature to change the destination of the quay and of the batture in front of the city of New Orleans.

" After so many solemn adjudications the defendants do not appear to have had any serious claims which they could compromise. So that, while the act of 1820 was a compromise, under the form of a donation, the act, executed in 1851, would seem to be a donation, under the form of a compromise. The plaintiffs acquired no rights under that act, the gift not being intended for them. The act passed by the Legislature in 1850 has been adduced by the defendants in support of some undefined right. It is our duty to give full effect to that act, so far as it changes the destination of a portion of the batture and authorizes the sale of it. But we deem it also our duty to disregard, as an assumption of judicial power unauthorized by the constitution, whatever in it may be considered as recognizing in the defendants any legal rights under the compromise, after the change of destination of the property." 8 An. 149.

What is this batture, levee or *locus publicus*, upon which the defendant has built its railroad tracks and depots, under the authorization of the Legislature? It is a public place, which combines the public purposes of a landing for steamboats and vessels, a place for the temporary deposit and keeping of goods, a place for the arrival and departure of travelers and their baggage, and a public highway for vehicles employed principally in the transportation of articles of commerce. It is a public thing, according to the definition of the Code. " Common property, to the use of which all the inhabitants of a city or other place, even strangers, are entitled in common, such as streets, the public walks, the quays." C. C 458. Wherever the public is concerned, the State is not without an interest, and may consequently legislate upon the subject. In this case, however, the Legislature has not changed the destination of the property, and the grants or privileges conferred upon the railroad company are for the convenience and benefit of the public. The testimony of witnesses has been referred to to show that the use of the batture by the railroad company will be in-

jurious to the commerce of this city. In my judgment, this testimony only proves that the witnesses are about a quarter of a century behind the age in which they live.

The defendant is a municipal corporation, which is defined to be "an investing the people of a place with a local government thereof." Such corporations are created and exist for the public advantage; they can exercise only such powers as are conferred upon them by the Legislature, which may be withdrawn from them by the Legislature at will, unless restrained by the constitution. There is no restraint on this power of the Legislature in the constitution of this State. The Legislature might take away the right of the city to legislate in any manner in regard to this batture. In the Fifth Annual our predecessors said: "The government of cities and towns, like that of the police juries of parishes, forms one of the subdivisions of the internal administration of the State, and is absolutely under the control of the Legislature." 661. Judge Dillon, in his work on municipal corporations, says: "With the exception of certain constitutional limitations, presently to be noticed, the power of the legislature over such corporations is supreme and transcendent; it may change, divide, and even abolish, at pleasure, as it deems the public good require." Page 70 et seq.; 3 Wend. 1325; Cooley on Constitutional Limitations, p. 191–2; 14 An. 406; 12 An. 515.

Municipal corporations are mere instruments or agents of the State government; consequently, if the city of New Orleans had actually purchased the batture it could not control it as a private individual could his property. "Being a mere agency of the government, it is evident that the municipality can not itself have that complete and absolute control and power of disposition of its property, which is possessed by individuals over their own. For it can hold and own property only for corporate purposes, and these purposes are liable at any time to be so modified by legislation as to render the property no longer available." Cooley C. L. p. 235.

At page 88 of his work Judge Dillon says: "The Legislature, as trustee for the general public, has full control over the public property and the subordinate rights of municipal corporations. Accordingly it may authorize a railroad company to occupy the streets in a city without its consent and without payment. See Clinton v. Railroad Company, 24 Iowa 455; People v. Kerr, 27 N. Y. 188; Railroad Company v. Applegate, 8 Dana 289; Wager v. Railroad Company, 25 N. Y. 526, 533; Pratzman v. Railroad Company, 9 Ind. 467; 13 Ind. 353, 551; Moses v. Railroad Company, 21 Ill. 522; Cooley on Con. Lim. 555, 556; 17 N. J. Eq. 75; 17 Barb. 494; 47 Pa. State 325, 35 Cal. 325. See also Redfield on Railways, page 259 vol. I. He says: "The fee of the streets of a

city, when it has been acquired by the municipality under the right of eminent domain, becomes a public trust for general public purposes, and is under the unqualified control of the Legislature; and any legislative appropriation of it to a public use, is not to be regarded as the appropriation of private property so as to require compensation to the city or municipality to render it constitutional."

I think the judgment of the district court should be affirmed.

## On Rehearing.

Morgan, J. The sole question presented in this case is, has the State the power to grant to a railroad company the right of way through a street in this city?

A thorough examination of this question has led us to the conclusion that it has.

It is therefore ordered adjudged and decreed that the judgment heretofore rendered by us be avoided, annulled and set aside, and it is now ordered adjudged and decreed, that the judgment of the district court be affirmed with costs.

Wyly, J., *dissenting*. The State can grant the right of way to a railroad company; but the company can only get the land necessary for the tracks and depots by expropriation or purchase.

I had occasion to express my views on the main question involved in the case in the opinion of the court, delivered on the nineteenth of May, 1873.

I therefore dissent in this case.

Taliaferro, J. I concur in the dissenting opinion of Mr. Justice Wyly.